Mr. Andre, please proceed. May it please the court. Your Honor, there are two patents that were invalidated on summary judgment grounds, one on anticipation and the other on 112 grounds. I'd like to talk about the 808 patent, which was invalidated on anticipation grounds first and then get into the one on 112. The district court made two errors in granting summary judgment of anticipation, the first being claim construction, the second being granting a summary judgment, but there were material issues of fact that were uncontested by the defendant. Starting with the claim construction issue first, the district court took the error. You also have to overcome a waiver issue as well? There was no waiver, Your Honor. All through the claim issue. But didn't she find there was waiver? So didn't she offer alternative grounds for why you wouldn't prevail on this particular one, waiver, and then alternatively the merits of the claim construction? She mentioned waiver in her order and then she went through and basically gave an opinion as to what the claim construction would be, but the fact of the matter is, is throughout the claim construction process, the parties had agreed that aqueous meant water. And so when we got the original construction from the court at the claim construction process, it was an aqueous solution containing water-soluble preparations from olives. So at that point, we had aqueous, meaning water. In the defendant's claim construction briefing, they agreed with that, so there could be no waiver. In fact, on JA559, in the defendant's claim construction briefing, they actually put in a statement, a declaration we had put in, stating that defining aqueous as something that is, quote, relating to, similar to, containing, or dissolved in water. And then in its reply brief, it also stated that the extracted aqueous, dash, is contained in water. The idea of the aqueous not being water was never even conceived of by anybody. Well, I don't think anyone's saying aqueous doesn't mean water. The question is, can it include other stuff in addition to water? I think that's the question. Can a composition that includes water and some form of alcohol be an aqueous solution? And technically, no. If it's aqueous in alcohol, it's an aqueous alcoholic solution. The inventor in the patent talked about two different solutions and used the alternative or, the word or. It's either aqueous or aqueous alcoholic. And district court said, the word or meant nothing there. It means and. This court has looked at that plain language on several occasions and has always construed or to mean or in the disjunctive. We couldn't find a single case where this court looked at the word or and held it in the conjunctive. We couldn't find a single case. Even if we agree with you that there was no waiver here, and we agree with you on claim construction, don't you still have an anticipation problem by virtue of, is it example three in Cuomo? Example four. Example four in Cuomo. Now, both Cuomo and Ramadi, both prior references that the district court relied upon, the testing of the phenol concentration, which is really the hydroxyl tyrosol versus olea rupin concentrations, those were done with non-aqueous extracts. And in fact, the preparations in Cuomo was originally done with water, but then after that, it went through a series of organic and inorganic solutions. Is there evidence in this record that would suggest that those ratios could have been changed by the methanol wash that occurred? Absolutely. We put an expert declaration in. This kind of goes to the second point. We put an expert declaration in from Dr. German. And the defense didn't have a single expert declaration. The district court granted summary judgment without anyone upscaling the art on the other side of the table. We had an expert declaration where Dr. German actually stated that different solvents, whether it be inorganic or organic, will give different concentrations because things dissolve differently in different solvents. But how would it change the weight ratio between hydroxyl tyrosol and tyrosol? It could be dramatic. Can you explain how? Because, I mean, to me it seems like all of these processing steps, whether it's in Cuomo or Romani, are designed simply to get the sample prepared for testing its characteristics. So how they collect the sample for testing is they put it through a chromatography column. And if you've ever done a chromatography column, you pour the sample on and the resin in the column will bind to the molecules. And they bind to them at different affinities, depending on the resin and the molecule. And when you wash the molecules off the column, they'll come off in different fractions. So the solvent you use to wash the molecules from the chromatography column is very important. And this is what Dr. German talked about. It's important for testing accuracy purposes, but I don't think it necessarily mutates the characteristics of the actual sample. It could actually mutate the actual concentration. For example, if hydroxyl tyrosol... Did he specify to that effect? He did. Dr. German actually put that into... What did he say? Where is that exactly, if you remember? If not, you can always bring it back up on rebuttal. I can bring it up on rebuttal for sure. But Dr. German actually talked about, because the different solvents will have different properties and molecules will come off the columns at different rates, you would actually get different concentrations. Because if hydroxyl tyrosol... Let's talk, when you say different concentrations, do you mean different weight ratios between hydroxyl tyrosol and tyrosol? It could be. Because if tyrosol and hydroxyl tyrosol and oleoerupin are going to bind to that column at different affinities, if you use different solvents, they could come off at different affinities. Right now, we're talking about a testing method and trying to get an accurate result from the testing method. And to me, that's a little bit different than the actual physical characteristics of the olive sample. Well, the olive sample itself, if you look at the prior art, the actual olive sample itself was not extracted. It wasn't an aqueous extract from the olive. They took the water and tossed it out and they took the pulp. Right, but in both references, both Romani and Cuomo, they both talk about having, at least at some point in the preparation process, an aqueous solution or aqueous phase. They both talk about that. Then, yes, maybe they wash it with methanol or ethanol or something like that to get it ready for being sent down the column. But at one point in time, they both have an aqueous extract. But it's not the extract of the olive. They use aqueous solutions to actually pull extracts off of an alcohol extract, for example. If you're extracting these chemicals from a solid mass and you extract it with alcohol to begin with, it's going to pull out different concentrations from the pulp. This is the whole idea here. What Dr. Crea did, of Creagre... And when you say concentrations, I still don't know exactly what you mean by that. Pull out different concentrations from the olive. What do you mean by that? If you were to take the pulp of the olive and you were trying to just get a solution from that, different organic solvents and inorganic solvents will dissolve different chemicals within this olive pulp differently. So you will pull out different concentrations of the phenols. So one may have a higher solvency versus a lower solvency. This is what Dr. German talked about. You can't compare the two. Is Dr. German's declaration in the record? It is. And at JA2596 is where Dr. German talked about the solvents and water have some compounds go to organic solvent and some go into the water. So some of these will go into solution with organic solvent and some will go with water and some, you know, one or the other. 2596. 2596 in the record. And this is also cited throughout the summary judgment briefing. The second point that I want to make is the fact of the matter is there were material issues of facts, but we did put in non-contested expert declarations. Can you just walk me through 2596? Sure. So this is the deposition testimony of Dr. German. So he said when they're talking about the partition, he said partition, the components between solvents, the practical example is maybe that you are using organic solvent and water and some of the compounds go into organic solvent and some go into the water. And that's the way of separating and isolating the two. He said that's exactly right. We also put this in his declarations as well. What's the translation of that? It means that different solvents will affect what molecules go into solution differently and which ones come out of the column differently. So, for example, if you were to use a water as the wash off the column, you may pull off very little hydroxyl tyrosol, whereas if you use alcohol, you can pull off much more. It'll go into that solution faster. They don't come off equally. Because Romani, you know, Romani's mission is to try to figure out the, he wants to learn the polyphenolic content of a bunch of different olive cultivars, right? So it's trying to make an assessment of what's the naturally occurring weight ratio of all these different compounds. And Romani was not the least bit concerned about the aqueous extracts at all. Romani was looking at the olive pulp. The fact of the matter is... Right, but the point is they did all of this testing and then they were able to figure out what is the naturally occurring weight ratio of that particular olive, the polyphenolic compound. Maybe it's the naturally occurring within the pulp itself, but it's not in the aqueous extract. This was what Dr. Crea's invention was about, was taking something that's been considered waste for hundreds of years in these olive oil producing countries and companies, and doing something good with it. So he took wastewater, or what they call black water, and did something so you could actually extract the phenol, you could actually get concentrations here. That's what his invention was about, using the aqueous extract from the olive. So you're saying that the weight ratio of these polyphenolic compounds would be different in the wastewater of an olive than whatever Romani was investigating with an olive pulp? Absolutely. And I think the patent even talks about that. Why would that be? Why would it be? Yeah. Because of the concentrate... The phenol compounds would stay in the olive fruit itself. The water actually being extracted from that would not necessarily... Because they don't go into solution and water at the same rate they would go into an organic solvent. It's more of a chemistry nature of the molecule where it would go into an organic solvent like alcohol as opposed to water. So it would go in differently. So there's testimony as to the process of extraction, but what about any testimony that the phenol ratios are taken out of the claimed ranges? The phenol concentrations disclosed in those prior references was not the issue that the court looked at, the district court. It was all about whether it's an aqueous extract or not. That was the point of contention between the parties. And what we're saying was not an aqueous extract. The only way she could find aqueous extract is if she actually changed the definition of aqueous to make it aqueous-alcoholic. And there's just no support in that whatsoever. We're into your rebuttal time. Would you like to save the remainder? I would. Thank you, Your Honor. Mr. Marshall? May it please the Court? I think that Judge Koh's finding of the waiver is quite clear here. She said it was a new and untimely claim construction, and she said that Criagri's attempt to re-litigate the construction of aqueous extract must be rejected. So that is a finding of waiver that they need. What do you mean re-litigate? That doesn't actually make sense because you all were the ones that proposed that aqueous and aqueous-alcohol. Judge, make sure you realize these are two different things, and you proposed that to her in several places. And then you said something along the lines at the very end, after nobody debated that point, at any point in time, none of her opinions addressed aqueous versus aqueous-alcohol. And then in the very end, you file a brief with a little footnote that says, we've simplified our construction to make things easier on the Court. Not that you have run away from your prior assertion that aqueous and aqueous-alcohol are different, but you're simply deciding to make things easier for the Court, which is always nice. But nonetheless, I don't see how you can conclude on that factual record that there's waiver. Your Honor, we originally did take that position. That is correct. And you never expressly disavowed it anywhere. We withdrew that from the Court's consideration. But you explained that the reason that you're withdrawing this is just to make it easier on the Court. And because up until that point in time, they hadn't disputed you on that point. Nowhere, right? Nobody at any point in time had disputed your assertion that aqueous and aqueous-alcohol were different. Your Honor, I disagree with that. They did dispute that. They consistently said that aqueous just means relating to containing or made with water. That is what they consistently said aqueous meant in their claim construction briefs. When we withdrew that distinction, we assumed that the Court would go with that meaning, which is exactly what the Court did, and said aqueous solution containing a water-soluble preparation, and essentially adopted their position. So we were fine at that point, in part because of the prior art, with the Court adopting that claim construction. The Court certainly had the exact same impression that we did when she found waiver that when we withdrew that distinction, that they were agreeing with us on withdrawing that distinction. So I don't think there's really any… Aqueous could include both aqueous and aqueous-alcohol. You nonetheless think because of the generalized construction they gave, they were implicitly rejecting your argument. Absolutely. They had a very, very, very broad construction of aqueous extract. It just meant water-soluble preparation. Aqueous alcoholic extracts are water-soluble. Alcohol is soluble with water. They're miscible. I mean, there's no dispute about that. So when we withdrew that and said we're fine with that part of the… that we're not going to contest that issue, that's exactly what we intended. You didn't say you weren't going to contest that issue. You said we're going to make it simpler for you. Well, I would agree with you, Your Honor, that we were probably not the model of clarity with respect to that. But we clearly withdrew it. So if I don't agree on this waiver point, tell me in the merits why you think she is correct that an aqueous solution includes an aqueous-alcohol solution. And in particular, it may in the abstract, but in light of this specification, which sets them out as alternatives in multiple places. Right. So what I would say is, Your Honor, that I hate to revert to the Venn diagram, but I'm going to have to here. Aqueous-alcoholic extract is a subset for aqueous extract. In other words, if we go with their construction or their definition of aqueous as relating to or containing or made with water, aqueous-alcoholic certainly relates to, is made with, and contains water. It's the same thing. Now, they emphasize the use of the term or, and they cite the SkinMedica case several times along with, I believe, one other unpublished opinion. The SkinMedica case makes it clear that when the terms that are separated by the word or are mutually exclusive, as they were in that case, because the beads were labeled as two-dimensional, that the cultures were done on, were contrasted with the three-dimensional cultures there, that those terms were defined by the inventor as being mutually exclusive, that the or there was consistent with those terms being completely different. Here, the terms as they have defined them are not mutually exclusive for the reasons that I've just said. An aqueous-alcoholic extract does, in fact, contain water. It is, in fact, water-soluble under their construction. So, it meets all of the definitional things that they advanced for what an aqueous extract is. At least for now. Claim construction is a question of law. And so, the role falls to me to figure out what these words mean and what they may have argued is all fine and well on the waiver point, but it doesn't really constrain me on the construction point if I'm, as a matter of law, interpreting these words. So, why wouldn't I look at this language and interpret aqueous and aqueous-alcohol as clearly intending to be two separate things? This will work in aqueous solutions or alternatively in aqueous-alcohol solutions. I would say, Your Honor, that aqueous-alcoholic is also aqueous.  If that's true, then the word aqueous-alcohol wouldn't have to be included at all in the specification, that this language would all be redundant. I said, you know, all boys, you know, have short hair. I wouldn't have to say including Mr. Marshall, you know, because you're a boy. So, it just seems like it would be entirely superfluous if I were to read it the way it is. I don't think it's superfluous. I mean, they described multiple ways of doing the extraction. And, like many other inventors, they got increasingly specific. They went from the general to the specific in the specification. So, I don't think that that would be unusual. Of course, I agree with you that claim construction is a matter of law, but you would still have to find a judge co-abused her discretion in finding waiver before you could get there. Now, I don't think you have to decide either of those issues because both Romani and Cuomo described both an aqueous extract, as they're now defining it, and an aqueous alcoholic extract. But she didn't reach that issue. She expressly didn't reach whether example four would otherwise establish anticipation. She just went all the way on alcohol. I think that's accurate, Your Honor, but example four does clearly say that the olive pulp is extracted with water. Sure, but the whole argument we were discussing ad nauseum up here was, since this is anticipation and the weight ratios were only measured after the methanol bath, can we assume that example four would have resulted in the same weight ratios or at least not removed it from the claim-limited weight ratios? Right. This is anticipation, so that's starting to get a little iffy for me. Well, I'm not sure it is. I mean, Judge Chen asked the question, you know, why is there any reason to believe that the steps for, you know, measuring on HPLC would, you know, for purifying and then measuring for HPLC would change the ratios. Except that the problem is that's sort of Judge Chen's question, and the issue is it's your burden of proof here. This is anticipation, and goodness sakes, on summary, judgment of all things. So it was for you to establish that they would never change the ratios. It wasn't for him to establish that they sometimes might. Your Honor, there's no reason to believe that the ratios would change. Well, that's nice for you to tell me, but see, since I'm not a chemist, it's kind of hard for me to necessarily be willing to go there with you. Well, okay, the problem with that argument, Your Honor, is then that would mean that they never possessed the invention in the first place. Because if you look at the way they measured in the 808 patent, if you look at the way they measured the hydroxytyrosols or alluropine or hydroxytyrosol to tyrosol ratios, they first had the olive waste water, which is, according to them, the egg waste extract. And then they did a subsequent extraction using supercritical carbon dioxide. And then they measured with HPLC. I assume that's an alcohol. So you're going to tell me it's a supercritical carbon dioxide? I don't know. It's not an alcohol, Your Honor. All right, okay. Yeah, but the point is that before they did the measurement, they had to go through an intermediate step to prepare the sample for HPLC, just like Romani did, just like Cuomo did. But the question is, no, no, Romani and Cuomo's steps are different. They washed with alcohol. You had me if you were going to tell me that carbon thing was an alcohol. But once you said it wasn't, how am I to assume? So they presented a case for, and then here's an intermediate step which isn't going to change anything. Here's my weight ratio. Well, you've got a whole different intermediate step in Romani and Cuomo. Why am I to assume that washing with alcohol wouldn't change anything simply because washing with that other thing didn't? They're two different substances. What I'm saying, Your Honor, is they haven't. If they're going to take the position that the process of measuring is going to change the weight ratios, which is essentially what they're doing, then they've never established in their own patent that they ever actually had the ratios in the aqueous extract because they also went through a process of purifying for the HPLC process. So they can't have it both ways. They can't say, well, yes, we determined the ratios in the aqueous extract. And no, those ratios weren't present in the aqueous extract because you had to do some steps to get it ready for the HPLC column. Do you not follow what I'm saying? Okay, I'm going to weigh you, right? Now, I'm going to weigh you, and I say, oh, yeah, you can have a conversation with him before I weigh you, no problem. And then I weigh you. I think it would be easy to say your weight before the conversation and after the conversation were identical. Alternatively, I say, I'm going to weigh you, and you say, can I go for a run and have lunch first? Also intermediary steps, and I say, sure, go ahead. Now I weigh you. I think it's much more difficult for me to say that your weight couldn't possibly have been changed, and given this is your burden on summary judgment of clear and convincing evidence and anticipation, it's a lot more difficult for me to conclude that your weight couldn't possibly have been changed by virtue of you running and eating. And since I'm not a chemist and you didn't put in any expert testimony, it's hard for me to reach any conclusion about whether a methanol wash could or could not change these weight ratios. Well, we did put in expert declarations, Your Honor, who opined that there was an aqueous extract with these ratios. They focused on example 11, right? Yes, but their expert did not say that there would be any change. It's your burden. It's his burden. In addition, I would like to point to you. Anticipation. You could have a good obviousness case. I would also like to point to the fact that in Romani and Cuomo, when they put the samples on the HPLC, they used water as the eluent, basically the solvent that the samples ran in. So right there, at the point of measurement, you have the hydroxytyrosol, tyrosol, and loropine in water being measured on the HPLC. And so if you want a point in time when it is in water, when it's in an aqueous extract, and it's being measured, just look at the way the HPLC methodology was performed in Romani and Cuomo. I should address the written description issue briefly, if there are any questions on that, since my colleague did not get to that. But the point I would like to make there is that essentially what we had was Dr. Correa saw publications indicating that hydroxytyrosol was an antioxidant and that it may have an anti-inflammatory effect. He essentially wrote a research proposal for studying the use of hydroxytyrosol and loropine in certain ratios to treat a bunch of different conditions, 10 of them, that may have some connection to inflammation. And then he incorporated that entire research proposal into a patent application with essentially no data to show that there was, in fact, a connection between using those compounds and treating those particular conditions. If that would have been enough, if you're saying what he had done was insufficient, what would be sufficient for written description enablement? Well, he should have had some either in vitro or in vivo data showing that the marker levels that he was claiming would change as a result of the treatment with these particular ratios of compounds did, in fact, change. But he did not have that for the vast, vast, vast majority of the conditions that he points to and that he claims in Claims 1 through 16. He did have this much data, which said that the isoprostein levels in the urine, he had a preliminary result saying that isoprostein levels in the urine, not the CSF, which is what is claimed in the patent, had changed. Is there something in our case law that says, as a matter of law, for enablement or written description for, I guess, a treatment method, you have to, at a bare minimum, as a matter of law, have in vitro testing? In vivo testing? Yeah. No, there is not. You can have in vitro testing as well as long as there's a clear connection between the in vitro testing and the disease model. And, in fact, the NRA 318 patent litigation, which was the case dealing with the Alzheimer's drug where they disclosed a model, I believe it was an animal model in that case. They said there is a model for testing that they had no data in the specification, and that patent was declared to be invalid as a result of the lack of data. So I would not hang my hat here on the in vivo versus in vitro distinction, but what I would say is that there has to be some data that all the conditions that they've claimed here could, in fact, be treated by this hydroxytyrosal to a lower pain ratio that is claimed in the 599 patent. Okay. Thank you, Mr. Marshall. Mr. Andre, you've got a little bit of rebuttal time left. Thank you. Thank you, Your Honor. I want to point out that the summary judgment in this case for both patents was granted without any evidence from one skilled in the art. It is something we did put in the expert declaration on the opposition of both these summary judgments. Your Honor, as per the site, it was JA2406-78 was the declaration. And Dr. German even went so far to say that Cuomo refers to the use of organic solvents, the methanol, which are not aqueous extracts. It's on page 30 and 31 of our brief. And then he goes on to say that he testified that extracting with methanol solvent is different because compounds either go into water or organic solvent. They go into one or the other. So we did put in evidence. The district court, by finding summary judgment, and this is summary judgment, clear and convincing evidence, did so with nothing but attorney argument and the opinion of the district court. That was it. There was no sites to any type of evidence other than looking at the prior art and interpreting what the lawyer said. But if I were to agree with your opposing counsel that she concluded waiver on the claim construction, what's your best argument for why that's not the case? Well, she went on and provided an opinion. Lots of district court judges do that for cases that are clearly destined for here. They give us alternative rationales. I mean, look what she did with the second patent. She decided utility, enablement, rent description. She was going to kill you every which way but Sunday. She's going to make sure you're damn well dead by shooting you three more times after you're not moving. So, I mean, why wouldn't that mean that you nonetheless have to overcome her waiver if I view it that way? In our papers, we actually cited that there was no waiver because, once again, there was an agreement that aqueous meant water. And I don't know how we can argue that aqueous means water when everyone agreed that aqueous meant water. Now they're trying to say aqueous meant water and whatever else you want to add to it. Why couldn't it be aqueous and hexane or aqueous and alcohol, whatever it is? Aqueous means water. That was never an issue. It was something we talked about in our claim construction process. You go through the meet and confers. No one ever contested that aqueous meant water. Now they're trying to say, oh, no, aqueous means water and there'd be no difference. You could add other stuff to it. Well, as Dr. German pointed out, if you add methanol to water, it fundamentally changes the characteristic of the solvent. Some things will go into a solution of methanol and some will go in water. But if you put both of them together, that molecule will go in a solution either way. So it does have a fundamental difference. Well, what was the claim construction you were asking for, the exact, precise construction that you were proffering? I believe it was something along the lines of the aqueous solution containing a water-soluble preparation. Something along that line. It was about being aqueous. Here it is. A water-soluble preparation from an olive plant. The difficulty with that is it's so broad that in the abstract it would include an aqueous alcohol solution because it just says a water-soluble preparation. So it could include water. As long as it includes water and it's water-soluble, it could, in fact, include other stuff. If you include the other stuff, then it wouldn't just necessarily be water-soluble. It could be soluble in methanol as well. So are you saying that when you used the terms water-soluble, you were meaning to expressly exclude aqueous alcohol extract? Absolutely, Your Honor. It's something that I think in the specification also dictates that by the alternative use of the two terms. If it was one term, as Your Honor said, there would be no need to say aqueous alcohol. So when you said water-soluble, did you mean only water? I'm just trying to understand what you mean by aqueous extract of olives. Can it have other stuff in it, too? The hydroxytyrosyl ratio has to come from the water solubility, the aqueous extract. It's not only water-soluble. If you put in the inorganic, then that would change. Are certain alcohols actually water-soluble? I don't believe alcohols are water-soluble. It is a solution. No, because once you have an alcohol group, an OH group on a… So couldn't you have a water-soluble solution that contains some alcohol? If something is dissolved in water, it doesn't necessarily mean it will dissolve in alcohol and vice versa. From a chemistry point of view, things can either go in solution in water or alcohol, generally speaking, or inorganic solvent. They have different types of solubility properties. If you're saying that… If it says aqueous extract or water-soluble, that means it has to be water-soluble. If you add something else to it, you don't know if it's water-soluble or if it's being soluble in the actual alcohol itself.  Appreciate your time. Thank you. The case is taken under submission.